IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 25, 2006

## BRETT ALLEN PATTERSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Montgomery County**
**No. 31496    Michael Jones, Judge**

---

**No. M2004-01271-CCA-R3-PC - Filed October 26, 2006**

---

Both the petitioner and his co-defendant were convicted by a jury of two counts of first degree murder, one count of aggravated rape and one count of first degree burglary. The petitioner was unsuccessful in his direct appeal to this Court. He subsequently filed a petition for post-conviction relief, which the post-conviction court denied. The petitioner was also unsuccessful in his appeal of that judgment. The petitioner filed a motion to amend his post-conviction petition to request DNA testing of evidence. The second post-conviction court denied that motion. The petitioner appeals this decision. We affirm the decision of the second post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT. JR., JJ., joined.

Brett A. Patterson, Pro Se, Only, Tennessee.

Paul G. Summers, Attorney General and Reporter; C. Daniel Lins, Assistant Attorney General; John Carney, District Attorney General; and Art Beiber, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Factual Background

Following his conviction, the petitioner filed a direct appeal with this Court. We summarized the underlying facts as follows:

On the night of January 9, 1987, Brett Patterson and Ronnie Cauthern drove to the home of Patrick and Rosemary Smith, who were both Captains in the United States Army assigned to Fort Campbell as nurses. The defendants wore masks and

gloves, and each carried a loaded revolver. After severing the telephone line, the defendants broke a door pane, unlocked the door, and entered the Smiths' house. They were after a large sum of money thought to be kept in the bedroom.

Once inside, the defendants discovered that the Smiths were at home asleep. They awakened them and pulled them out of bed. Patrick Smith tried to fight them off, while Patterson made repeated attempts to subdue him by applying a "sleeper," a wrestling hold designed to cause unconsciousness. Failing this, Patterson strangled Mr. Smith with a length of "880" military cord. Investigators later recovered similar cord from the defendant's residence when they searched it.

Mrs. Smith was strangled with a silk scarf into which a narrow vase was inserted to form a tourniquet. The medical examiner found that the cartilage in her throat had been fractured, an injury which would have resulted only from application of great force. Mrs. Smith had also been raped.

When neither of the Smiths reported for duty on the following morning, two of their co-workers drove to their home to investigate. Finding the door glass broken, they called the police. Investigators arrived promptly and discovered Patrick Smith's body in the master bedroom, and Rosemary Smith's body in a guest bedroom.

The house had been ransacked and numerous items stolen, including articles of clothing, seventy dollars cash, personal checks, credit cards, a video cassette recorder, Mrs. Smith's engagement and wedding rings, her watch, and her purse. The keys to their two cars were also taken.

In the master bedroom, investigators found a piece of paper with Cauthern's name on it. Also written on it was the Smiths' phone number, address, and directions to their residence.

On the morning of January 12, 1987, an informant contacted the police and told them that Patterson and Cauthern, both of whom the informant knew well, had admitted taking the Smiths' property, sexually abusing Mrs. Smith, and killing them both.

The informant related to investigators how Patterson and Cauthern had broken into the house, described the method by which the Smiths had been strangled, and told of having seen several of the items stolen from their residence. The informant said that Cauthern was confident that he and Patterson would not be caught because they had worn masks and gloves.

Investigators then proceeded to the residence that the defendant shared with Cauthern and a third person-Eric Barbee. When they arrived, all three men were present and officers saw several of the stolen items in the trunk of Cauthern's car. The residence was searched, and a large amount of incriminating evidence was seized.

Both defendants were arrested; both gave detailed and highly inculpatory confessions.

State v. Brett Patterson, No. 88-245-III, 1989 WL 147404, at *1-2 (Tenn. Crim. App., at Nashville, Dec. 8, 1989), perm. app. denied (Tenn. March 5, 1990). The petitioner and his co-defendant were convicted in a joint trial for two counts of first-degree murder, one count of first degree burglary, and one count of aggravated rape. Id. at *1. The jury determined that the petitioner should be sentenced to life in prison for the murder convictions. The trial court sentenced the petitioner to ten years for the burglary and forty years for the rape. Id. The trial court ordered the murder sentences and the rape sentence to be served consecutively, with the burglary sentence to be served concurrently with the first life sentence. Id. This Court affirmed the petitioner's convictions and sentences on direct appeal. Id. at * 10.

The petitioner filed a Petition for Post-conviction Relief on October 29, 1992. Brett Allen Patterson v. State, No. 1999 WL 701455, No. 01C01-9805-CC-00221, at *1 (Tenn. Crim. App., at Nashville, Sept. 10, 1999), perm. app. denied (Tenn. April 24, 2000). This petition was amended several times. Id. The post-conviction court held hearings on December 9, 1996 and April 4, 1997. Id. Following the last hearing, the post-conviction court dismissed the petitioner's petition. Id. On appeal, we affirmed that judgment. Id. at 15.

On March 27, 2001, the petitioner filed a motion to reopen his post-conviction petition alleging newly-discovered evidence. On September 9, 2003, the petitioner filed a motion for the post-conviction court to accept an amended post-conviction petition instead of his motion to reopen his post-conviction petition. The petitioner subsequently filed an "Amended Motion for DNA Testing of Evidence and Petition for Post-Conviction Relief."

On May 3, 2004, the second post-conviction court filed an order and an opinion denying the petitioner's motion for DNA testing and his second petition for post-conviction relief. The petitioner appealed the denial of his motion and petition.

## ANALYSIS

The petitioner presents nineteen issues for review in his brief. The second post-conviction court addressed one issue on the merits, the DNA analysis issue. The second post-conviction court determined that the majority of the other issues had been previously addressed in the petitioner's direct appeal or his first petition for post-conviction relief and subsequent appeal to this Court.

These conclusions were included in the order denying the petitioner's second petition for post-conviction relief.

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the court's findings unless the evidence in the record preponderates against those findings. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997); Alley v. State, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. See State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

**Previously Determined and Waived Issues**

The petitioner's remaining issues include: (1) the petitioner has suffered total denial of due process; (2) the prior findings of fact of the trial court and Court of Criminal Appeals are erroneous on their face; (3) the investigatory raid was a warrantless intrusion without probable cause; (4) the warrantless arrest was against constitutional protections; (5) warrantless searches of the petitioner's residence, automobiles, and surrounding areas violated constitutional protections; (6) interrogations of the petitioner and his statement to law enforcement officers was against constitutional protections; (7) the search warrant for the petitioner's residence was based on an affidavit including false statements; (8) the trial court erred in ordering the redaction of the statements of the defendants at trial and the standard applied by the trial court was erroneous; (9) the redacted statements were allowed in as evidence against the petitioner's right to confront witnesses; (10) the trial court erred when it allowed the redacted statements in before reviewing them; (11) the trial court erred when it ruled Patterson's statement as redacted was admissible; (12) the testimony of James Andrew was prejudicial hearsay; (13) the State's witnesses, Bobby Gray, Michael Breedlove, Earl Crockarell, James Andrew and Joseph Denning, presented perjured testimony; (14) the assistant district attorney committed prosecutorial misconduct by lying to petitioner's counsel and the trial court about the existence of exculpatory statements; (15) the State withheld exculpatory evidence consisting of statements of two witnesses and a police report; (16) petitioner was provided ineffective assistance of counsel because appointed counsel failed to investigate the raid, arrest, detention and interrogation of the petitioner; (17) the petitioner was denied the effective assistance of counsel because of a lack of effort to investigate the case, defend the petitioner and subject the State's case to an adversarial testing; and (18) the petitioner has been denied the right to a fair trial.

These issues are not open for review by this Court. Issues (3) through (11) as listed above were addressed in the petitioner's direct appeal. See State v. Brett Patterson, No. 88-245-III, 1989 WL 147404 (Tenn. Crim. App., at Nashville, Dec. 8, 1989), perm. app. denied (Tenn. March 5, 1990). Issues (16) through (17) were addressed in petitioner's first post-conviction petition. See

<u>Brett Allen Patterson v. State</u>, No. 01C01-9805-CC-00221 (Tenn. Crim. App., at Nashville, Sept. 10, 1999), <u>perm. app. denied</u> (Tenn. Apr. 24, 2000).

Furthermore, in a post-conviction proceeding, "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless" the claim is based upon a newly-recognized constitutional right with retroactive application or the ground was not presented as the result of State action in violation of the federal or state constitution. Tenn. Code Ann. § 40-30-206(g); <u>see</u> <u>State v. Benson</u>, 973 S.W.2d 202, 208 (Tenn. Crim. App. 1998). The remaining issues are neither based upon a newly-recognized constitutional right, nor were they presented on either direct appeal or the first post-conviction petition because of the State's action in violation of the Tennessee or United States Constitutions. Therefore, the remaining issues are also waived.

## DNA Testing

Under Tennessee Code Annotated sections 40-30-304 and -305, a post-conviction court may order DNA analysis if the post-conviction court finds four factors. Tennessee Code Annotated section 40-30-204(1) requires that the post-conviction court find that "[a] reasonable probability exists that the petitioner would <u>not</u> have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis . . . ." (emphasis added). Tennessee Code Annotated section 40-30-305(1) requires that the post-conviction court find that "[a] reasonable probability exists that analysis of the evidence will produce DNA results which would have rendered the petitioner's verdict or sentence <u>more favorable</u> if the results had been available at the proceeding leading to the judgment of conviction . . . ." (emphasis added). The remaining three factors are identical for both sections:

> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
> (3) the evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-304(2)-(4) & -305(2)-(4).

When this Court reviews a post-conviction court's decision determining whether to grant relief under the DNA Post-conviction Act, the lower court is afforded considerable discretion and our scope of review is limited. <u>Sedley Alley v. State</u>, No. W2006-00179-CCA-R3-PD, 2006 WL 1703820 at * 5 (Tenn. Crim. App., at Jackson, June 19, 2006)(citing <u>Sedley Alley v. State</u>, No. W2004-01204-CCA-R3-PD, 2004 WL 1196095 at * 3 (Tenn. Crim. App., at Jackson, May 26,

2004), perm. app. denied (Tenn. Oct. 4, 2004).; Raymond Roger Jones v. State, No. E2003-00580-CCA-R3-PC, 2004 WL 2821300 at *6 (Tenn. Crim. App., at Knoxville, Dec. 3, 2004), perm. app. denied (Tenn. Mar. 21, 2005) (citing Willie Tom Ensley v. State, No. M2002-01609-CCA-R3-PC, 2003 WL 186647 at *3 (Tenn. Crim. App., at Nashville, April 11, 2003)). Prior opinions of this Court on direct appeal, as well as appeals from prior post-conviction petitions or habeas corpus petitions, may be considered by the trial court in reaching its decision. Sedley Alley, 2006 WL 1703820 at * 5. In addition, "[a] determination of the evidence and surrounding circumstances is necessary to evaluate whether exculpatory results would have prevented prosecution or conviction or would have resulted in a more favorable verdict or sentence." State v. David I. Tucker, No. M2002-02602-CCA-R3-CD, 2004 WL 115132 at *2 (Tenn. Crim. App., at Nashville, Jan. 23, 2004). The evidence considered by the lower court may include "the evidence presented at trial and any stipulations of fact made by either party." Sedley Alley, 2006 WL 1703820 at * 5.

The petitioner argues that both section 40-30-304 and 40-30-305 apply to his situation. He argues, under Tennessee Code Annotated section 40-30-304, that conclusive DNA evidence would have proven that his admission to raping the victim was in actuality false and, therefore, the jury would not have convicted him of aggravated rape. In the alternative, he argues, under Tennessee Code Annotated section 40-30-305, that if the jury had been provided conclusive proof, through the DNA evidence, that he had not had sexual contact with the victim, the trial court would have sentenced him to a lesser sentence, possibly to the extent of concurrent sentences instead of consecutive sentences.

The State argues that the petitioner is unable to meet the first requirement of both Tennessee Code Annotated sections 40-30-304 and 40-30-305. Both those sections require that the petitioner show that he would not have been prosecuted or that he would have received a more favorable outcome if the DNA evidence had been present. The State argues that there was overwhelming evidence presented at trial, so this requirement could not be met in either statute. Therefore, the State argues that the second post-conviction court's judgment was correct.

The second post-conviction court's findings with regard to the DNA issues are as follows:

Brett Patterson and Ronnie M. Cauthern were found guilty of first degree murders of Patrick L. Smith and Rosemary Smith. Both were convicted of raping Mrs. Smith. Mr. Patterson was sentenced to life for the murders; Mr. Cauthern was sentenced to death.

Mrs. Smith was discovered in a separate bedroom. Her nightgown was found inside out with two buttons ripped from it. These two buttons were found on the bed and near the bed. Mrs. Smith was left strangled and nude.

Inside this bedroom a red comforter was seized. On this comforter there were two visible stains, one characterized as wet and one as dry. (Vol IX, p.4) This

-6-

comforter was marked as Exhibit 24. A rape kit was performed during the autopsy and delivered also to TBI for analysis.

A multitude of exhibits and testimony link Mr. Patterson to the killings of both Mr. and Mrs. Smith. During the search of Mr. Patterson's closet, a blue cowboy hat was found that contained two sets of keys. These sets of keys were matched to the Smith's door locks and vehicles. (Vol. IX pps. 71-75). Also a Members Only leather jacket was found in the same closet; this jacket was identified as being the coat of Patrick Smith. (Vol. IX 76). Mr. Patterson confessed to the killings as well as having "normal sex" with Mrs. Smith. (Vol. IX 148). Mr. Patterson also confessed to Joseph Denning that he killed two persons. (Vol. X, p. 34). Specifically Mr. Patterson stated to Mr. Denning that he had killed these two persons (referring to the Smiths) and that he had to help "Ronnie kill one of them.["] (Vol. X, p. 52).

Constance Howard, a forensic serologist, testified that she examined a stain on Mrs. Smith['s] nightgown. Spermatozoa were found. All other tests on this stain were inconclusive. Ms. Howard also tested the comforter. These tests revealed sperm also. Other tests were inconclusive. The rape kit taken by Dr. Harlan was provided to Ms. Howard for testing. Again spermatozoa were present. Also she found PGM type I. PGM type I was consistent with Mr. Cauthern, but inconsistent with Mr. Patterson. (Vol. XII pps. 10-14).

Sandra Lee Poltorak, a criminalist in the microanalyst section of the TBI, testified that she compared the right shoe of Mr. Patterson with the prints on the Smith's door and concluded that the two partial shoe tracks on the door could have been made by the right shoe. (Vol. XII. P.21).

Dr. Charles Harlan testified as to the causes of death. In response to hypothetical questions, Dr. Harlan stated that the vaginal smear would not automatically collect a specimen of all of those who might have ejaculated. (Vol. XII. P. 147).

The above is a brief synopsis of the evidence against Mr. Patterson. There can be no doubt that he is guilty of the two first degree murders and the results of any DNA testing would have no impact upon that decision.

[The petitioner] has filed a petition to have certain evidence analyzed for DNA comparison. As stated above a rape kit and a piece of a comforter were analyzed, but not for DNA comparison. Statements were made by the State and the attorney for the petitioner that at least the comforter still exists.

. . . .

[The petitioner's] presence in the Smith's home is not in issue; all of the proof established that he was present and participated in the homicides. Mrs. Smith was found with her nightgown removed, buttons town [sic] away and the gown inside out. [The petitioner's] confession to Mr. Breedlove specifically admitted the rape. Mr. Breedlove specifically asked Mr. Patterson the nature of the rape and Mr. Patterson responded as stated above. There are more than ample facts to corroborate the confession. The testimony of Dr. Harland [sic] in reference to the rape kit established under the peculiar facts of this case that DNA evidence would not be extremely helpful to Mr. Patterson. The testimony of the expert concerning the comforter clearly excluded Mr. Patterson as the person who contributed to that spot. If we were to assume that DNA analysis excluded Mr. Patterson as a donor, the other circumstantial evidence and confession of Mr. Patterson beyond any doubt established that there is no reasonable probability that the petitioner would not have been prosecuted or convicted if the DNA was exculpatory. Even if the DNA evidence was exculpatory, Mr. Patterson would have been convicted of all offenses. There is nothing that would establish any probability that Mr. Patterson's results would have been more favorable in the verdicts or the sentences.

We now turn to whether the post-conviction court was correct in denying the petitioner post-conviction relief under the DNA Post-conviction Act. As we stated above, both Tennessee Code Annotated sections 40-30-304 and -305 have four requirements. If any of the four qualifying criteria is not present, the post-conviction court can dismiss the petition. Sedley Alley, 2006 WL 1703820 at * 5.

The trial court recited several pieces of evidence that were presented at the petitioner's trial. We have reviewed both the record at trial and the record of the second post-conviction proceedings. The post-conviction court points out that the evidence presented against the petitioner at trial was overwhelming. As the post-conviction court stated in its order, there is no question that the petitioner was guilty of the two first degree murders. There was an overwhelming amount of evidence presented at trial consisting of various confessions by the petitioner, testimony by witnesses, various items belonging to the victims found in the petitioner's possession and other physical evidence present at the crime scene. The lack of DNA evidence would have no impact on his prosecution, convictions, the resulting verdict or his sentence with regard to the two first degree murder convictions.

We now analyze whether the presence of DNA evidence would fall under the parameters of Tennessee Code Annotated sections 40-30-304 and -305 with regard to his aggravated rape conviction. As the post-conviction court stated, Special Agent Michael Breedlove with the Tennessee Bureau of Investigation testified at trial regarding his interview of the petitioner. In that interview, the petitioner admitted having intercourse with the victim. When asked if he put his penis in her vagina, the petitioner replied that he and the victim had normal sex. The petitioner also stated that the victim was undressed and that they did not speak during the encounter.

Constance Howard was a forensic serologist with the Tennessee Bureau of Investigation at the time of the petitioner's trial. She tested the victim's nightgown and the comforter on the victim's bed for semen and sperm. She was able to conclude that there was sperm on the victim's nightgown. However, the sample did not enable Ms. Howard to complete any further testing with regard to the blood type of the depositor of the sperm. Ms. Howard also tested a stain on the victim's comforter. Once again, Ms. Howard was only able to conclusively determine that sperm was present on the comforter. Ms. Howard also tested a rape kit that Dr. Charles Harlan, the Consultant Forensic Pathologist at the time of trial, retrieved during his autopsy of the victim's body. As a result of her tests on the rape kit, Ms. Howard concluded that a vaginal swab did include spermatozoa. Ms. Howard also conducted further tests for PGM which is another substance, other than an individual's blood type, which is secreted into bodily fluids. The victim was a PGM type I. The petitioner's co-defendant was also a PGM type I. The petitioner was a PGM type II. The vaginal swab from the rape kit showed a PGM type I secretion, which Ms. Howard testified was consistent with either the victim or the co-defendant.

Dr. Harlan testified that he collected a rape kit during his autopsy of the victim. The following exchange occurred at trial:

> Q.      I have a matter here that I have to phrase it like in a hypothetical, but believe me, I am relying upon proof we have heard in doing so, Dr. Harlan. But, we have heard the testimony of the lady who did – at the TBI Crime Lab, who received your specimens from Rosemary Smith. And let's assume that there has been proof that both of these subjects, both of these defendants admit that they had sexual intercourse with her, rather immediately before she died – let's assume for my question that. Now, let's assume that from the specimens that you retrieved or did take from Rosemary Smith's vaginal area, when submitted to the lab, – let's assume she has testified that she found merely a – I don't know what this stuff is – but, a PGM type –
>
> A.      Yes, sir.
>
> Q.      You probably know what I am asking you, but I don't even know what that is.
>
> A.      That is an enzyme.
>
> Q.      Okay, let's assume that she testified that she found such an enzyme and that was consistent with the defendant, Ronnie Cauthern. What I am asking you now, after putting all of these hypotheticals before you, does that automatically mean that he was the only one that had the sexual intercourse with her that night?

A.      No sir, nor does that specifically indicate that he is the person who had that intercourse. It means that some person with that particular PGM enzyme type would be the person to have done that.

Q.      Well, if there were three or four different people say, who had intercourse that had different type PGM enzymes, would your sample – would it necessarily include findings as to all three or two or four?

A.      It would include – it would mean that there was intercourse or that serum was applied to that area from a person of that type.

Q.      But did your – does the fact of the smear, the specific, maybe, location of how it was obtained, would it automatically collect all or a speciman [sic] of all of those who might have ejaculated?

A.      No, sir.

Following our analysis of the evidence presented with regard to the aggravated rape conviction, we conclude that there is ample evidence to support the post-conviction court's conclusion that DNA evidence would neither result in the petitioner not being prosecuted or convicted nor receiving a more favorable verdict or sentence. The defendant was convicted at trial even though the serologist testified that the contributor of the stain on the comforter was unable to be determined and that the petitioner's co-defendant was the contributor of the semen collected in the rape kit. If a DNA test was run on the sample either the petitioner's DNA would be present or not. We infer that the petitioner would prefer that his DNA is not present in the sample. However, the jury in the original trial was presented with physical evidence that implicated only his co-defendant, yet the jury still convicted the petitioner based upon his confession and Dr. Harlan's testimony that a sample would not necessarily contain physical evidence against everyone who might have had sexual intercourse with a victim. There is no reasonable possibility that the lack of DNA evidence against the petitioner would change the outcome at a new trial because the jury based its conviction on evidence that included physical evidence which did not implicate the petitioner. The lack of the petitioner's DNA in the sample would not change the outcome. Therefore, we find that DNA evidence would not result in either the petitioner not being prosecuted or convicted or receiving a more favorable verdict or sentence.

This issue is without merit.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the second post-conviction court.

-10-

_____
JERRY L. SMITH, JUDGE